**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DAVID SCOTT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 18 C 11 |
| v. | ) | |
| | ) | |
| ROBERT WILKIE, Secretary of the | ) | |
| United States Department of | ) | Judge Thomas M. Durkin |
| Veteran Affairs, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff David Scott brings this lawsuit against his employer, the Department of Veterans Affairs (the "VA"), alleging race discrimination and retaliation under Title VII, 42 U.S.C. § 2000e, *et seq.* for its failure to promote him. The VA moved for summary judgment. R. 31. For the following reasons, the VA's motion is granted in part and denied in part.

## Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of

evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Background

The following facts are undisputed unless otherwise noted.

***Scott's VA employment.*** David Scott, who is African American, began working at the Edward Hines Jr. Veterans Administration Hospital ("Hines VA") in 1991 as a GS-6 grade police officer. R. 38 ¶ 1. In 1999, he was promoted to sergeant, a GS-7 position. *Id.* ¶ 2. Scott applied for one of three GS-8 grade lieutenant positions in 2006. *Id.* ¶ 3. The three openings were awarded to an African American female and two Caucasian males. *Id.* Scott filed an Equal Employment Opportunity ("EEO") claim contending that his non-selection was based on his race. *Id.* ¶ 4. Ultimately, he and the VA settled, and Scott was promoted to lieutenant at the Hines VA service and distribution center, supervising 5 police personnel. *Id.* ¶¶ 5, 8. Scott transitioned to the credentialing center in 2011, where he again served as a GS-8 grade lieutenant and was responsible for issuing identification badges. He supervised 4 or 5 non-police employees. *Id.* ¶¶ 7-8.

In 2013, Gary Marsh became chief of Hines VA police. *Id.* ¶ 6. Thereafter in 2014, Scott applied for an open criminal investigator position. Chief Marsh ultimately selected a Caucasian applicant, Cary Kolbe, whose disciplinary history the Seventh

Circuit subsequently described as "abysmal." *Id.* ¶ 9; *Henderson v. Shulkin*, 720 Fed. App'x 776, 782 (7th Cir. 2017). Scott and fellow African American applicant James Henderson filed EEO claims contending that their non-selection was based on race. *Id.* Henderson ultimately filed a federal lawsuit. R. 38 ¶¶ 9-12. Initially, summary judgment was entered for the VA, but the Seventh Circuit reversed the order, and remanded the case to the district court for trial. *Henderson*, 720 Fed. App'x 776. The jury thereafter found for the VA. Henderson's appeal remains pending. R. 38 ¶ 12.

Meanwhile, in May 2016, Scott applied for the captain position—a GS-9 supervisory police officer position—at Building 215, which houses the Hines VA's Office of Information and Technology ("HITC"). *Id.* ¶ 13; R. 33-1, Ex.3. The primary purpose of the captain position is to provide operational support in planning and directing HITC police and security operations, and to assign patrol and special duties. Scott had been serving as acting captain for about 6 weeks when he applied for the permanent position. R. 38 ¶¶ 14-15. Scott, John Bailey—a Caucasian employee already serving in a GS-9 position as a physical security specialist—and two other applicants were selected to interview. *Id.* ¶¶ 16-17. Chief Marsh chose Deputy Chief of Police Ed Jones (African American), Building 215 security specialist Aaron Gatterdam (Caucasian), and Hines VA's chief of information technology Ed Wlodarski (Caucasian), to serve on the interview panel. *Id.* ¶¶ 18-19. Each panelist was provided a packet containing five interview questions regarding the candidates' "experience and accomplishments that relate[d] to the competencies" and were "important for the success" of the position, and a guide on how to score candidates. *Id.* ¶ 21. Jones led

the interviews, after which each panelist rated the candidates' answers on a 5-point scale. Those scores, totaled here by candidate and panelist, were as follows:

| 2016 Building 215 Captain Interviews | | | | |
|---|---|---|---|---|
| Candidate Name | Deputy Chief Ed Jones | Aaron Gatterdam | Ed Wlordarski | Total Score |
| John Bailey | 24 | 19 | 18 | 61 |
| David Scott | 23 | 14 | 15 | 52 |
| Donald Barnes | 17 | 16 | 15 | 48 |
| Eric Ousley | 16 | 15 | 16 | 47 |

*Id.* ¶¶ 20, 23-24, 27-30. Scott raises no issues with the interview guidelines, questions or procedure.

The scores were then communicated to Chief Marsh, who states that he selected Bailey because of them, as he contends was his usual practice when convening an interview panel. *Id.* ¶¶ 31-33. But Scott believes based on a discussion he had with Chief Marsh that Marsh selected Bailey because of his supervisory experience, which he contends is inferior to his own. R. 33-1, Ex. 2 at 82.

According to each of the panelists, neither race nor any candidate's protected activity was considered or discussed during the interviews. R. 38 ¶ 26. But Scott believes that Chief Marsh and "possibly" panelist Gatterdam discriminated and retaliated against him. He does not suspect that either panelist Jones or Wlodarski did. *Id.* ¶¶ 34-37, 39-41. When asked why he felt Gatterdam's decision was based on race, Scott explained that Chief Marsh told him about complaints Gatterdam had previously made to him regarding Scott's sporadic absences from Building 215 while

acting captain, and that he may have used those absences against him. *Id.* ¶¶ 35, 37. Gatterdam denies taking Scott's absences into account in his interview scores, *id.* ¶ 36, and Scott offers no other explanation for how Gatterdam was racially biased. When asked why he felt Gatterdam's score reflected retaliatory animus, Scott admitted that he was not sure that Gatterdam was aware of his prior protected activity (and Gatterdam testified that he was not). *Id.* ¶¶ 25, 38. And while the parties dispute whether Jones was aware of Scott's EEO activity, they agree that Wlodarski wasn't. *Id.* ¶ 25.

Scott filed an administrative EEO complaint challenging his 2016 non-selection as based on race and in retaliation for prior EEO activity. *Id.* ¶ 42. Ultimately, in October 2017, the VA's Office of Employment Discrimination Complaint Adjudication issued a final agency decision that Scott had failed to demonstrate either discrimination or retaliation. *Id.* ¶ 43; R. 33-2, Ex. 18.

While Scott's 2016 EEO claim was still pending, Bailey was promoted to Deputy Chief of Hines VA Police, and Scott and African American lieutenant James Gowdy were selected to interview for the Building 215 captain position Bailey's promotion left open. R. 38 ¶¶ 44-45. Gowdy had not engaged in protected activity and had less supervisory experience than Scott. But he had more military and work experience outside the VA. R. 33, Ex. 2 at 90; R. 38 ¶ 47; R. 41 ¶ 12. Ultimately, Gowdy was selected in or about December 2017 following two rounds of interviews by different panels, the second on which Chief Marsh served. Scott submitted a FOIA request following his non-selection. A document Scott received in response reflects

that the initial interview panel rated him highest. R. 38 ¶ 46. The record does not reflect the results of the second interview panel or why a second panel was convened, but the VA maintains that Gowdy received the highest score and that Chief Marsh selected him for that reason. *Id.* ¶ 47; R. 41 ¶ 13. Scott then filed another EEO claim, the status of which is unclear. R. 38 ¶ 48.

*Other complaints and remarks.* Meanwhile, in response to a proposed suspension for his own performance issues in October 2017, Chief Marsh explained in writing that he had not yet retired despite a variety of health problems because he "felt committed to stand up against individuals that would file complaints for the sole purpose of trying to get money from the agency when nothing was due to them." R. 41 ¶ 16. As discussed further below, Scott also offers an array of allegations that Chief Marsh and his predecessor discriminated and retaliated against other employees, and regarding a discriminatory and retaliatory environment at Hines VA generally. More specifically, Scott submits: (1) deposition transcripts in lawsuits by other VA employees concerning other employment decisions; (2) district court decisions denying summary judgment for the VA in some such lawsuits and a Seventh Circuit decision vacating summary judgment for the VA in another; (3) documents related to the EEO investigations that underlie some of the lawsuits; and (4) affidavits and declarations of Scott and other VA employees alleging discriminatory and retaliatory conduct by Chief Marsh and the racially-charged environment at Hines VA generally.

*Scott's complaint and the VA's motion.* The parties dispute whether Scott's amended complaint properly alleges claims regarding both the 2016 and 2017 non-

selection decisions (the former for discrimination based on race and retaliation for engaging in protected activity, and the latter for retaliation only), or just the 2016 non-selection decision. The VA seeks summary judgment as to both to the extent properly before the Court.

## Analysis

Title VII forbids an employer from discriminating against an employee because of his race, color, religion, sex or national origin. 42 U.S.C. § 2000e-2(a)(1). Employers are also prohibited under Title VII from retaliating against an employee who "filed a complaint or participated in an investigation of an unlawful employment practice." *Robertson v. Dep't. of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020) (citing 42 U.S.C. § 2000e-3(a)).

Under *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), a Title VII plaintiff's non-selection claim survives summary judgment if the plaintiff presents evidence that, "considered as a whole," allows a reasonable jury to find that his protected characteristic or prior protected activity caused his non-selection. One way in which a plaintiff can proceed is through the now-familiar *McDonnell Douglas* burden-shifting framework, under which he first must establish a prima facie case of discrimination, the employer then presents evidence of a non-discriminatory reason for its decision, and the burden ultimately shifts back to the plaintiff to establish that the employer's reason is pretextual. *See Volling v. Kurtz Paramed. Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) (*McDonnell Douglas* is a "common, but not exclusive" method to establish a "triable issue of intentional discrimination"). But ultimately

and regardless of the method used, all evidence is placed "in a single pile," and the question "is simply whether the evidence would permit a reasonable factfinder to conclude that [the plaintiff's] race . . . or [protected activity] caused" his non-selection. *Ortiz*, 834 F.3d at 765-66.

The VA analyzes the evidence under *McDonnell Douglas*, but Scott relies only on *Ortiz*. The Court's analysis thus begins with the *McDonnell Douglas* framework before "assess[ing] cumulatively all the evidence." *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

## I.     Preliminary Matters

Before turning to the merits, the Court addresses the VA's argument that Exhibits 5-10 and 14 to Scott's Local Rule 56.1 statement of additional facts, R. 38 ("Plaintiff's SOAF")—deposition transcripts in other lawsuits and a statement by one of the plaintiffs in the underlying EEO investigation that led to one such case—must be excluded because Scott did not disclose or produce them before relying on them here. *See* R. 40 at 3-5. The VA specifically points to Federal Rule of Civil Procedure 37(c)(1) as the basis for exclusion. That rule prevents a party from using information to "supply evidence on a motion" when the party failed to provide it as required by the rules governing initial and supplemental disclosures, unless such failure was "substantially justified" or "harmless." Fed. R. Civ. P. 37(c)(1). Scott did not identify the documents comprising the relevant exhibits or reference the cases in which they arose in his Mandatory Initial Discovery Pilot ("MIDP") disclosures. But except for Chief Marsh's deposition transcript in *Bredemeier v. McDonald*, No. 15 C 7514 (N.D.

Ill.)—Exhibit 9 to Plaintiff's SOAF—each such exhibit originated in an action or underlying EEO investigation that Scott identified in his discovery responses. Scott's discovery responses refer repeatedly to "witness statements," "filings," and "EEO investigation files" in each case to which the exhibits relate: *Henderson v. Shulkin*, No. 15 C 4445 (N.D. Ill.), *Borja v. Shulkin*, No. 17 C 2340 (N.D. Ill.), *Henderson v. Shulkin*, No. 17 C 4465 (N.D. Ill.), and *Henderson v. Wilkie*, No. 18 C 4685 (N.D. Ill.). *See generally* R. 33-2, Ex. 20. The VA does not contend that the deposition transcripts were not filed in those actions, and nor does it assert that it lacks control of the files to the extent Scott did not produce them.[1] And Scott's disclosure in discovery satisfies his disclosure obligations. *See* MIDP order at 2-3 ("If new information is revealed in a written discovery response . . . the information need not be presented in a supplemental response."). Scott's discovery response is thus sufficient as to all but Chief Marsh's deposition in *Bredemeier* (Exhibit 9), which the Court excludes under Rule 37(c)(1).[2]

---

[1] The VA represents that for "many of these cases" Scott produced no documents. R. 40 at 4. But the VA does not specify the cases to which this statement pertains.

[2] Further, the result would not change even if the Court did consider Exhibit 9, because the deposition testimony cited examines Marsh's handling of a sexual harassment investigation involving Caucasian employee Cary Kolbe versus a similar investigation involving African American employee Benjamin Levy, and as such provides no information or insight on the promotions at issue here. (Moreover and as discussed *infra*, the district court in the lawsuit Levy subsequently filed regarding Chief Marsh's treatment of him versus Kolbe granted summary judgment for the VA.)

## II.    Merits

### A.    2016 Non-Selection Claims (Counts I and II)

As stated, Scott contends that his 2016 non-selection for the Building 215 captain position was based on his race and/or in retaliation for his prior EEO claims. The Court examines each in turn.

***Race Discrimination (Count I).*** The *McDonnell Douglas* framework requires a plaintiff alleging discriminatory failure-to-promote to first demonstrate that: (1) he belonged to a protected class; (2) he was qualified for the position; (3) he was rejected for the position; and (4) the employer promoted someone outside of the protected class who was not better qualified. *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 892 (7th Cir. 2016).

The only dispute insofar as the prima facie case is concerned is how Bailey's qualifications measure up to Scott's. Scott argues that he was more qualified because he had been serving as acting captain (while Bailey had declined that opportunity) and had supervised other employees at the time (while Bailey did not). R. 41 ¶ 6. But Scott's service as acting captain does not render him more qualified as a matter of law, or under any identified VA practice or policy. And Scott does not contend that Bailey never supervised employees. Nor could he; the record shows that he previously supervised twice as many employees as Scott ever had. *See* R. 33-2, Ex. 12 (interview notes reflecting Bailey's experience supervising 6-10 employees).

Scott also contends that he is more qualified because Bailey had previously falsified police records—an act for which he says Chief Marsh fired an African

American employee, evidencing discriminatory animus. R. 37 at 9. However, the investigation of and disciplinary fallout from any such falsification of records—about which the VA contends there is insufficient evidence of Bailey's involvement—occurred under Chief Marsh's predecessor and almost 7 years before the 2016 promotion decision. Accordingly, any concern about the handling of that investigation or the disciplinary results that followed cannot be attributed to Chief Marsh, and nor can it establish that Chief Marsh discriminated when he disciplined other employees following the investigation of similar allegations. Further, assuming that Bailey had falsified records, that does not demonstrate that Scott was more qualified; criminal investigations are not the focus of the Building 215 captain position. Instead, the fact that each interview panelist scored Bailey higher on each of the interview questions points to the opposite conclusion.

Even if Bailey were not better qualified, Scott still must rebut the VA's proffered reason for its decision under *McDonnell Douglas*, or otherwise put forth evidence from which a reasonable juror could conclude that Scott was not selected because of his race. To show pretext, Scott must demonstrate that the VA was "dishonest rather than simply foolish or unreasonable." *Schmitt v. Cent. Processing Corp.*, 675 Fed. App'x 615, 620 (7th Cir. 2017). He could do so "directly by showing that a discriminatory reason more likely motivated his [non-promotion], or indirectly by showing that [the VA's] explanations are unworthy of credence." *Senske v. Sybase, Inc.*, 588 F.3d 501, 507 (7th Cir. 2009).

When the employer's proffered reason is that it selected the most qualified candidate, evidence of competing qualifications does not establish pretext unless the differences are "so favorable to the plaintiff that there [could] be no dispute among reasonable persons" that he was "clearly better qualified." *Mylnczak v. Bodman*, 442 F.3d 1050, 1059 (7th Cir. 2006). While as noted Scott does not address the evidence under *McDonnell Douglas*, even if he had, considering the analysis above, any pretext argument fails to the extent based on his versus Bailey's qualifications.

Scott also calls into question the VA's proffered reason for Bailey's selection: his superior interview scores. Scott claims that Marsh told him the decision was due to Bailey's supervisory experience. R. 38 ¶ 32. But while the deposition testimony Scott cites suggests that he had a discussion with Marsh about the two candidates' experience in that regard, it in no way reflects that Marsh selected Bailey because of it. *See* R. 33-1, Ex. 2 at 82 (Scott's deposition testimony indicating with little context that Scott did not believe Bailey's selection was due to interview scores because Marsh told him he "felt [John Bailey] had more supervisory experience than I had").[3]

Scott also claims that Marsh told him that Gatterdam's interview score may have been influenced by Scott's absences while serving as acting captain. Scott cites that as his sole reason for "possibly" believing that Gatterdam discriminated against him due to his "race or a personal issue, which is still wrong." R. 33-1, Ex. 2 at 52. But racial animus cannot be inferred from the mere fact that absences were

---

[3] Further, as noted *supra*, Bailey's experience was superior to Scott's in at least some respects.

considered in a promotion decision, and nor is taking an employment action because of a "personal issue" unlawful. More to the point, Gatterdam refutes any such speculation, stating that his score was not influenced by Scott's absences, and rejecting any notion that it was influenced by race (or protected activity) either. R. 33-1, Ex. 9. Further, even if the Court were to credit Scott's feeble argument and exclude Gatterdam's scores, Bailey's totals are still highest. Scott offers no other evidence or argument of discrimination by Gatterdam, nor does he believe or offer evidence that either Jones—who is himself African American—or Wlodarski discriminated against him in setting their scores. R. 33-1, Ex. 2 at 51, 55. In sum, Scott offers no evidence of racial animus by the panelists.

In an attempt to bolster his claim and survive summary judgment under *Ortiz*, Scott points to an array of allegations concerning employment decisions related primarily to other employees. The VA contends that such evidence should be excluded as irrelevant or that it is otherwise inadmissible under Federal Rule of Evidence 403. *See* R. 40 at 6-8. But evidence of other discriminatory (or retaliatory) employment decisions can sometimes be admitted to show intent or pretext. *Manuel v. City of Chi.*, 335 F.3d 592, 596 (7th Cir. 2003). That said, such evidence is not admissible to establish the defendant's propensity to act in a particular manner. Fed. R. Evid. 404(b). As such, even if offered for a permissible purpose (like intent or pretext), its admission must be supported by a "propensity-free" chain of reasoning, under which it isn't enough to ask *whether* the proposed evidence is relevant to a permissible purpose, but rather courts must also ask *how. United States v. Gomez,* 763 F.3d 845,

856 (7th Cir.2014) (en banc). That is, courts must "consider[ ] what inferences the jury is being asked to draw from that evidence, and by what chain of logic," and exclude it if it is clear that "the jury is essentially being asked to rely on the evidence as proof of the defendant's propensity" to engage in the conduct alleged. *United States v. Lee*, 724 F.3d 968, (7th Cir. 2013).

The probative value of the other-act evidence must also be weighed against its potential to prejudice the defendant, confuse the issues, mislead the jury, or cause delay. Fed. R. Evid. 403; *United States v. Anzaldi*, 800 F.3d 872, 882 (7th Cir. 2015). Probative value turns in part on similarity and recency, as "ancient or dissimilar acts tend only to prove propensity." *Wofford v. Celani*, 2012 WL 2847549, at *1 (N.D. Ill. July 11, 2012). And other-act evidence that is otherwise unrelated to the employment decision at issue is considered of limited—if any—value. *See Lewis v. City of Chi. Police Dep't*, 590 F.3d 427, 443-44 (7th Cir. 2009) (evidence of discrimination and retaliation against others in trial concerning acts aimed at plaintiff is "of limited value"); *Grayson v. O'Neil*, 308 F.3d 808, 816 (7th Cir. 2002) ("Evidence of generalized racism directed at others" not relevant unless it bears "some relationship" to the decision at issue); *see also Matthews v. Wakesha Cty.*, 759 F.3d 821, 829 (7th Cir. 2014) ("As an individual rather than a class action, . . . evidence of a pattern or practice can only be collateral to evidence of specific discrimination against the

plaintiff herself.") (citing *Gilty v. Vill. of Oak Park*, 919 F.2d 1247, 1252 (7th Cir.1990)).[4]

Scott's "other acts" evidence runs the gamut from suggestions of discriminatory and/or retaliatory failure to promote as here, to allegedly race-based disciplinary disparities and investigations concerning sexual harassment. Setting aside for the moment the numerous ways in which the facts and circumstances of these allegations are different, the Court notes that the sheer number of complaints is not evidence of wrongdoing, as not all claims have merit. Nor do the three judicial opinions Scott offers as evidence establish that discrimination or retaliation occurred in those cases. Indeed, the two district court decisions merely denied the VA's motions for summary judgment. *See Bredemeier v. Wilkie*, 2018 WL 3707803 (N.D. Ill. Aug. 4, 2018); *Borja v. Shulkin*, 2018 WL 6725565 (N.D. Ill. Dec. 21, 2018). And although the Seventh Circuit vacated summary judgment for the VA in *Henderson v. Shulkin*, 720 Fed. App'x 776 (7th Cir. 2017), the jury subsequently found for the VA.

Further, none of the cases concern the decisions at issue here, and the circumstances and context involved in each are distinguishable. Indeed, the plaintiff in *Borja* alleged a racially segregated promotion procedure for two open lieutenant positions, but ultimately settled. *See generally* 2018 WL 6725565; *see also* 17 C 2340, R. 65. Scott does not claim that a similar promotional procedure was utilized here.

---

[4] The Court notes that Scott's complaint purports to allege a pattern and practice claim. But his is not a class action. As such, any "pattern and practice" evidence of discrimination or retaliation against others is merely collateral to evidence that the VA discriminated or retaliated against Scott directly. *Matthews*, 759 F.3d at 829.

And while *Henderson* concerned the selection of Caucasian applicant Cary Kolbe for criminal investigator over African American plaintiff James Henderson and Scott himself, that decision occurred approximately 2 years before Scott's initial non-selection as Building 215 captain and involved a different selection process and entirely different context. *See Rowe v. Shulkin*, 2019 WL 2060951, *11 (N.D. Ill. May 9, 2019) (rejecting reliance upon *Henderson* as "unrelated," "with different facts, individuals, and job announcements at issue"). Scott's opposition brief does not even mention *Bredemeier*, so the Court declines to consider it here.

The VA also contends that the Court should not consider the declarations and affidavits Scott submitted from himself, VA lieutenant Donald Barnes, police officer and union steward Thomas Johnson, and police officer Benjamin Levy (all of whom are African American). According to the VA: 1) they are "rife with conclusory statements [and] speculative conclusions;" and 2) like the rest of Scott's "other acts" evidence, the minimal probative value they reflect would be outweighed by the potential to confuse the issues or delay any trial of Scott's claims. R. 40 at 8-9. The Court agrees that these affidavits and declarations are to some extent conclusory in nature.[5] And more importantly, the affidavits from Barnes, Levy and Johnson

_____

[5] *See* Plaintiff's SOAF, Ex. 1 ¶ 28 (Scott's declaration stating "Chief Marsh bends over backwards to promote less qualified white officers and officers without protected activity."); *see also* Plaintiff's SOAF, Ex. 2 ¶¶ 9, 18 (Barnes affidavit stating that Chief Marsh selected "White officers with far less experience than some African American officers who applied" and that Hines VA's hiring, promotion and staffing practices were "clearly and often explicitly based on race"); Plaintiff's SOAF, Ex. 3 ¶ 5 (Johnson affidavit stating that Marsh promoted a white officer "over more qualified minority officers"); Plaintiff's SOAF, Ex. 4 ¶ 7 (Levy affidavit stating that he has "no doubt" that his race and protected activity were the reasons for his own unfair treatment).

concern almost exclusively other employment decisions, including some under supervisors other than Marsh. Indeed, aside from his general and conclusory testimony outlined above, Levy speaks only of his own experiences—under both Chief Marsh and his predecessor—and complains that Marsh disciplined him harshly in 2016 for conduct similar to that for which Cary Kolbe was not disciplined several years prior because of Levy's race and prior protected activity. Plaintiff's SOAF, Ex. 4 ¶¶ 5-6. Johnson and Barnes also complain about disciplinary "passes" Kolbe received relative to African American employees with protected activity, and his promotion to criminal investigator despite his employment record, as well as alleged discrimination or retaliation by Marsh and his predecessor against others (including Johnson himself). *See* Plaintiff's SOAF, Exs. 2 and 3.

At the outset, the Court rejects any reliance by Scott on allegations regarding decisionmakers other than Chief Marsh, and notes that the VA obtained summary judgment on Levy's allegations of discriminatory and retaliatory discipline relative to Kolbe in another lawsuit. *See Levy v. O'Rourke*, 2020 WL 1468034 (N.D. Ill. Mar. 26, 2020). Further, as discussed, the VA successfully defended its decision to promote Kolbe to criminal investigator at trial in *Henderson v. Shulkin*, No. 15 C 4445 (N.D. Ill.). And these allegations regarding treatment of other employees and the other allegations in the affidavits and record generally regarding still other employment decisions are at most minimally relevant to the issues here. Considering them would surely result in several trials-within-Scott's-trial, confusing the issues and causing undue delay in contravention of Federal Rule of Evidence 403. Indeed, if allowed, the

parties would "no doubt argue[ ] over the truthfulness" of the allegations, "necessarily shifting the focus of the trial" away from Scott's. *Manuel*, 333 F.3d at 597. And because Scott's "other acts" evidence appears relevant to show pretext and intent only via an inference that Marsh has a propensity to discriminate and retaliate, the Court doubts that it passes muster under Federal Rule of Evidence 404(b), either. *See Gomez*, 763 F.3d at 863. Accordingly, the Court declines to consider it.[6]

Finally, Scott's SOAF points out that the *Henderson* court considered Chief Marsh's alleged statement in 2015 that he wanted to keep shifts "black and white," and Hines VA's nickname as "the Plantation" to be evidence of discriminatory animus, and that both the remark and nickname were attested to here. Plaintiff's SOAF ¶ 19 & Exs. 2 and 3. But that evidence was just one of several factors that led to the reversal of summary judgment in that case. *See Henderson*, 720 Fed. App'x at 785 (circumstantial evidence of discriminatory animus together with shifting explanations for selection decision and the fact that the selectee was wrongly certified for the position without explanation together and among other factors warranted reversal of summary judgment). In contrast, even if Chief Marsh made the "black and white" statement (which he disputes), it's nothing more than an ambiguous "stray remark" in the context of this case that cannot fend off summary judgment. *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 694-95 (7th Cir. 2006). Nor does Hines VA's

---

[6] Even if the Court did consider Scott's "other acts" evidence, it would not change the Court's conclusion, where Scott does not challenge the selection process or meaningfully challenge the interview panelists, and can show neither that the result they reached nor Chief Marsh's reliance on it was wrong.

alleged nickname, however distasteful, reasonably connect the promotion decision—which was unambiguously tied to interview scores—to Scott's race.

In sum, Scott asks the Court to overlook the lack of evidence of wrongdoing as to the decision not to select him as captain in 2016 in favor of inferences that he contends can be drawn from allegations regarding others. But whether considered under *McDonnell Douglas* or "cumulatively" under *Ortiz*, there isn't enough from which a reasonable jury could conclude that Scott was passed over because of his race, where: 1) Bailey scored higher than Scott and the other interviewees according to each panelist on each interview question;[7] 2) there is no evidence that any panelist harbored race-based animus; 3) Scott does not contend that the selection process was itself biased; and 4) other than stray remarks or allegations of discrimination related to other employment decisions, there is no evidence that discriminatory animus affected Marsh's decision here. Summary judgment is proper on Scott's discrimination claim.

***Retaliation (Count II).*** Scott's 2016 retaliatory non-selection claim also fails. To succeed on a Title VII retaliation claim, a plaintiff "must produce enough evidence for a reasonable jury to conclude that (1) she engaged in statutorily protected activity; (2) the [employer] took a materially adverse action against her; and (3) there existed a but-for causal connection between the two." *Robertson*, 949 F.3d at 378 (quoting *Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 695 (7th Cir. 2017)).

_____

[7] The fact that Bailey was already employed in a GS-9 grade position also suggests that the selection decision was not discriminatory.

There is no dispute that Scott filed EEO claims regarding his VA employment prior to his non-selection for the captain position in 2016. But two of the three panelists (Gatterdam and Wlodarski) were not even aware of those claims. The parties dispute whether Jones was, but even assuming he was (and dropping his interview scores from the overall totals for the panel), Bailey's score is higher than Scott's and the other candidates'. Further, Chief Marsh and Jones's awareness of Scott's prior EEO activity is not enough on its own to survive summary judgment. *See Rowe*, 2019 WL 2060951, at *16 (Marsh's awareness of plaintiff's prior EEO activity not enough to sustain retaliation claim). On the other hand, Marsh's October 2017 statement that he chose not to retire because he "felt committed to stand up against individuals that would file complaints for the sole purpose of trying to get money from the agency when nothing was due to them" suggests retaliatory animus. R. 41 ¶ 16. But that remark is not enough for a reasonable factfinder to conclude that Scott would have been promoted but-for his prior protected activity, where it was made over a year after the decision in question. *See Nichols v. S. Ill. Univ.-Edwardsville,* 510 F.3d 772, 781–82 (7th Cir.2007) ("stray remarks that are neither proximate nor related to the employment decision [at issue] are insufficient to defeat summary judgment"). Nor can allegations of retaliatory conduct by Marsh (or others) in other employment decisions meet Scott's burden to establish but-for causation here. As stated, at least two of the panelists were not even aware of Scott's prior EEO activity, Bailey earned the highest interview scores, and his selection resulted in a lateral move versus what

would have been a promotion for Scott. Summary judgment is proper on Scott's 2016 retaliatory non-selection claim.

### B.   2017 Non-Selection Claim (Count II)

Scott also claims that his 2017 non-selection for the Building 215 captain position was in retaliation for prior protected activity. But the VA contends that: (1) Scott did not properly plead this claim; (2) Scott did not exhaust it even if properly plead; and (3) Scott lacks sufficient evidence of retaliatory animus.

As to the VA's first argument—that the 2017 non-promotion decision is not part of Scott's complaint—the Court disagrees. After the parties' summary judgment conference and with the Court's permission, Scott amended his complaint to make clear that it was. The VA also argues that Scott's 2016 and 2017 retaliatory non-selection claims should have been enumerated in separate counts (rather than addressed together in Count II as they were), citing this Court's decision in *Kole v. Village of Norridge*, 941 F. Supp. 2d 933, 941 (N.D. Ill. 2013). But the complaint's factual allegations more than adequately place the 2017 non-selection at issue, and the concerns that led to the Court's conclusion in *Kole* are not present here. *Compare* R. 24 (Scott's 9-page, two-count complaint reflecting allegations of non-selection in 2016 and 2017, and including a retaliation count (Count II) for the VA's having "twice denied [Scott] a promotion to Captain" in favor of "less qualified" selectees "without prior protected activity"), *with Kole*, 941 F. Supp. 2d at 941 (dismissing first count of 78-page complaint in part because it "lump[ed] together four or five different constitutional amendments with little explanation of how Defendants allegedly

violated each," failing to provide even "basic notice" of the claims). Despite the VA's urging, nor does Scott's failure to seek additional discovery post-amendment automatically bar his claim. (And if the VA felt it needed more discovery, nothing prevented it from making the request—a suggestion the Court made at the summary judgment conference and inquired of the parties at the status conference thereafter. R. 30 at 3 (June 5, 2019 status at which both parties represented that no further discovery was necessary regarding the 2017 non-selection)).

The VA fares no better on its failure-to-exhaust argument, because a "separate administrative charge is not prerequisite to a suit complaining about retaliation for filing [an] EEOC charge." *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1312 (7th Cir. 1989), *superseded by statute on other grounds*; *see also Luevano v. Wal-Mart Stores, Inc.*, 733 F.3d 1014, 1030 (7th Cir. 2013) ("to avoid . . . endless loops of charge/retaliation/charge/retaliation, etc.," a plaintiff "who alleges retaliation for having filed a charge with the EEOC need not file a second EEOC charge to sue for that retaliation"). The VA contends that this exception does not apply because Scott's claim is "based on alleged retaliatory acts committed *before*" he filed a claim. R. 40 at 13 (quoting *Zegarra v. John Crane, Inc.*, 218 F. Supp. 3d 655, 664 (N.D. Ill. 2016) (emphasis in original)). Not so; Scott filed an EEO claim as early as 2006, and the alleged retaliatory acts at issue here were in 2017. R. 38 ¶ 4.

Finally, the evidence establishes a genuine issue for trial. While the VA contends that Chief Marsh made his 2016 promotion decision for the same position based on interview scores, and that he did so again with regard to the 2017 decision,

the VA provides no explanation for Chief Marsh's decision to convene a second panel in 2017 after Scott scored highest in the first.[8] And it is undisputed that Chief Marsh himself sat on the second panel, for which the record contains no evidence of the scores. R. 38 ¶ 47. Importantly, there's also Chief Marsh's remark at the time of the 2017 selection decision that he had not retired because he "felt committed to stand up against individuals that would file complaints for the sole purpose of trying to get money from the agency when nothing was due to them." R. 41 ¶ 16. A reasonable juror could conclude from Chief Marsh's failure to provide an explanation for convening a second panel, his decision to place himself on the interview panel, and his remark that he sought to hire Gowdy over Scott due to Scott's prior protected activity, and thus retaliated against Scott.[9] Summary judgment is denied as to Scott's 2017 retaliation claim.

---

[8] Also troubling is that Chief Marsh attested that Gowdy was selected for scoring highest on both panels (not so), while at the same time the VA stated that he was selected for scoring highest on just the second. R. 33-1, Ex. 3 ¶ 12 (Marsh declaration indicating that Gowdy selected "after he received the highest score from two interview panels"); R. 38 ¶ 47 (the VA's statement of facts indicating that Gowdy was selected based on his higher interview score following the second panel); R. 32 at 14 (opening brief indicating that Gowdy was chosen based on his second round interview score).

[9] The VA also states that Chief Marsh selected Gowdy based on a review of Gowdy's versus Scott's resume. These inconsistencies only serve to confirm that summary judgment is improper. *See Applebaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003) ("One can reasonably infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision.").

## Conclusion

For these reasons, the VA's motion is granted as to Scott's 2016 discriminatory (Count I) and retaliatory (Count II) non-selection claims, but denied as to the portion of Count II concerning Scott's 2017 non-selection. R. 31.

ENTERED:

_____

Honorable Thomas M. Durkin
United States District Judge

Dated:  April 8, 2020